UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
ALEJANDRO CARRILLO, *on behalf of
himself and all others similarly situated,*

                                    Plaintiff,

   -against-

WELLS FARGO BANK, N.A.,

                                    Defendant.
------------------------------------------------------------x

**REPORT AND
RECOMMENDATION**

18-CV-3095 (SJF)(SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

Presently before the Court in this putative class action litigation asserting claims under the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.* and N.Y. Gen. Bus. Law ("GBL") § 349, and for breach of contract under New York law, on referral from the Honorable Sandra J. Feuerstein for Report and Recommendation, is Defendant Wells Fargo Bank, N.A.'s ("Defendant" or "Wells Fargo") motion to dismiss Plaintiff Alejandro Carrillo's ("Plaintiff" or "Carrillo") First Amended Complaint (the "Amended Complaint" or "FAC"), Docket Entry ("DE") [17], brought on behalf of himself and all others similarly situated, pursuant to Fed. R. Civ. P. 12(b)(6), or in the alternative, to strike the FAC's class allegations under Fed. R. Civ. P. 12(f) and 23(d)(1)(D) ("Defendant's Motion"). *See* Notice of Motion, DE [33]; Memorandum of Law in Support of Defendant's Motion ("Def.'s Mem."), DE [34]; Reply in Support of Defendant's Motion ("Def.'s Reply"), DE [36]; *see also* November 13, 2018 Order Referring Motion. Carrillo opposes Wells Fargo's motion. *See* Plaintiff's Response to Defendant's Motion ("Pltf.'s Opp."), DE [35]. For the reasons

set forth below, the Court respectfully recommends denying Wells Fargo's motion in its entirety.

## I.   Background

### A.   <u>Relevant Facts</u>

The following facts are taken from the FAC and its exhibits, unless otherwise stated, and are accepted as true for the purposes of Defendant's Motion.

On June 15, 2017, Carrillo obtained a mortgage loan from Wells Fargo in connection with the purchase of a residence located in Great Neck, New York (the "Loan"). *See* FAC ¶¶ 31, 33. Although the FAC does not attach the loan note or mortgage at issue, it does include a copy of a Closing Disclosure, which "is a statement of final loan terms and closing costs." *See* FAC, Ex. A (the "Closing Disclosure"), DE [17-1], at 1. The Closing Disclosure states that the Loan – carrying a principal balance of $144,000 to be paid off over a 30-year term – bore an initial interest rate of 2.875%, which could be adjusted to a rate as high as 3.875% beginning in the second year of repayment. *See id*. The Closing Disclosure also contains an Adjustable Interest Rate Table (the "AIR" Table) further describing the interest schedule. *See id*.; *see also* FAC ¶ 35. The AIR Table reiterates that the Loan will accrue interest at a rate of 2.875% during the first year of repayment, before increasing to 3.875% thereafter. *See* Closing Disclosure at 4.

Plaintiff and Defendant also entered into a Buydown Deposit Agreement on the same day the Loan was made, which indicated that Carrillo deposited an up-

front sum of $926.03, to be held in escrow by Wells Fargo and applied to Plaintiff's first-year repayments on a prorated basis, as a portion of the interest being paid therewith. *See* FAC, Ex. B (the "Buydown Agreement," and together with the Closing Disclosure, the "Loan Documents"), DE [17-2], ¶¶ 1, 3.[1] The Buydown Agreement provides that nothing contained therein "shall be construed to contradict the Note or Mortgage, and in the event of any conflict, the Note or Mortgage shall prevail." *See id*. ¶ 11. Annexed to the Buydown Agreement is a payment schedule (the "Buydown Payment Schedule") describing how the deposit would be applied to the Loan's repayments. *See* DE [17-2] at 4. The Buydown Payment Schedule dictates that the "Buydown Rate" in the first year is 2.875% (mirroring the initial interest rate listed in the Closing Disclosure) and then goes on to state, in a smaller font, that the "note will bear an interest rate of 3.875% ...." *See id*. As for monthly payments, the Buydown Payment Schedule provides that Plaintiff will owe $597.45 per month during the first year of the repayment term (reduced by one twelfth of the buydown deposit), and $677.15 per month thereafter. *See id*.

According to Defendant, the Buydown Agreement's listing of the $597.45 initial repayment amount reflects what the amortized payments would be *if* a

---

[1] Although the Buydown Agreement implies that Carrillo tendered this deposit, in opposing Defendant's Motion, Plaintiff contends that Wells Fargo paid this sum itself. *Compare* Buydown Agreement at 1 ("Carrillo … [has] obtained a residential mortgage loan from [Wells Fargo], and a sum of money, called the '*buydown deposit*' has been paid to and received by [Wells Fargo] to hold and administer"), *with* Pltf.'s Opp. at 4 ("Wells Fargo incorrectly characterized the funds used for the 'rate buydown' … as being provided by Plaintiff, when in fact they were provided by Wells Fargo"); FAC ¶ 10 (same). In any event, this distinction need not be resolved at this stage as it does not materially alter the viability of Carrillo's claims.

2.875% interest rate were in effect throughout the life of the Loan, as opposed to meaning that the Loan would actually accrue interest at that reduced percentage at any point. *See* Def.'s Mem. at 3; Def.'s Reply at 3. Conversely, Carrillo contends that the Loan Documents dictate that interest would *accrue at the Buydown Rate* in year one. *See* FAC ¶¶ 3, 4, 6, 38. These divergent interpretations amount to the crux of this litigation. Plaintiff therefore alleges that, despite the parties' agreement that the Loan would accrue interest in the first year at 2.875% before increasing to 3.875% in subsequent years, Wells Fargo amortized the payments by calculating interest at the higher rate from the start, causing a greater outstanding balance than agreed upon heading into year two. *See id*. ¶ 38. Thus, Carrillo's principal balance after his first year of repayments was purportedly $478.13 higher than it should have been, which, in turn, has resulted in interest accruing on an inflated balance ever since. *See id*. ¶ 45; *see also* Pltf.'s Opp. at 4 ("The inflated balance will cost Plaintiff $1,471.00 in interest over the life of the loan").

In addition to detailing his own borrowing experience, Carrillo alleges that similarly situated individuals are being subject to Wells Fargo's practice and policy of charging mortgagors inflated interest rates. Specifically, Plaintiff claims that Defendant enters into hundreds of thousands of mortgage contracts nationwide each year, and regularly markets and employs boilerplate payment reduction programs, including buydown products mirroring Carrillo's Buydown Agreement. *See id*. ¶¶ 52-53, 55, 73. As a result of Wells Fargo's use of form documents and

automated procedures, the methods used to calculate interest rates and other loan data is purportedly invariable between customers. *See id*. ¶ 54.

## B.    **Procedural History**

Based on the above, Carrillo commenced the instant action on May 25, 2018, asserting three causes of action, each on behalf of himself and a putative class, for: (i) breach of contract, including the covenant of good faith and fair dealing; (ii) violations of GBL § 349; and (iii) violations of TILA.  *See* Complaint, DE [1], at 11-13.  On August 24, 2018, Wells Fargo served Plaintiff with a motion to dismiss the Complaint or, in the alternative, to strike its class allegations.  *See* DE [14].   In response, Carrillo filed the Amended Complaint – as a matter of right – on September 7, 2018.[2]  *See* FAC; *see also* Fed. R. Civ. P. 15(a)(1)(B) (permitting a party to file an amended pleading once as a matter of course within 21 days of being served with a motion to dismiss).  The FAC asserts the same three causes of action, each of which remain brought on behalf of Carrillo and a putative class.  *See* FAC ¶ 47.   On September 21, 2018, Defendant served Plaintiff with its motion to dismiss the FAC or, in the alternative, to strike the class allegations.  *See* DE [18].  Wells Fargo's motion was fully briefed and filed on November 9, 2018, and subsequently referred to this Court by Judge Feuerstein for Report and Recommendation.  *See* DEs [33] – [36]; *see also* November 13, 2018 Order Referring Motion.

---

[2] By filing the FAC, the original Complaint became moot.  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect") (internal quotation and citations omitted).

On January 11, 2019, Wells Fargo moved this Court to stay discovery pending the outcome of the instant motion, arguing that such relief was warranted given the possibility of eliminating the need for, or greatly reducing the scope of, disclosure. *See* DE [38]. Carrillo opposed that motion, contending that his meritorious claims, the lack of burden on Wells Fargo should discovery proceed, and the prejudice to him and the putative classes militated against the stay. *See* DE [39]. In light of this action's assertion of claims on behalf of three distinct proposed classes, one of which (the TILA class) being nationwide, this Court stayed discovery, pending the disposition of Defendant's Motion. *See* DE [45].

## II.  Discussion

The Court will first address Defendant's Motion inasmuch as it is directed at the merits of Plaintiff's causes of action, and will then turn to Wells Fargo's request to strike the class allegations. As discussed below, the Court respectfully recommends denying the motion in its entirety.

### A.  Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)

#### i.  Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). A complaint "that

offers only 'labels and conclusions' or 'a formulaic recitation of the elements of a cause

of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965).

In reviewing a motion to dismiss, the Court must accept the factual allegations

set forth in Plaintiff's FAC as true and draw all reasonable inferences in his favor.

*See LaFaro v. New York Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).

The Court may consider:

> (1) the factual allegations in the complaint, which are
> accepted as true; (2) documents attached to the complaint
> as an exhibit or incorporated . . . by reference; (3) matters
> of which judicial notice may be taken; and (4) documents
> upon whose terms and effect the complaint relies
> heavily, *i.e.,* documents that are "integral" to the
> complaint.

*Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 498 (S.D.N.Y. 2003) (internal citation

omitted); *see also Miotto v. Yonkers Pub. Sch.*, 534 F. Supp. 2d 422, 425 (S.D.N.Y.

2008) ("[I]n assessing the legal sufficiency of a claim, the court may consider only the

facts alleged in the complaint, and any document attached as an exhibit to the

complaint or incorporated in it by reference").

ii.   <u>Merits of Plaintiff's Causes of Action</u>

Applying the standards outlined above, and for the reasons set forth below, the

Court respectfully recommends denying Defendant's motion to dismiss.

a.   *Breach of Contract*

The Court first concludes that Carrillo has plausibly alleged a cause of action

for breach of contract.  "To establish a claim for breach of contract under New York

law, a plaintiff must demonstrate '(i) the formation of a contract between the parties;

(ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages.'"[3] *Zorbas v. U.S. Tr. Co.*, 48 F. Supp. 3d 464, 474 (E.D.N.Y. 2014) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)).  Here, there is no apparent disagreement whether the first, second, and fourth elements have been pled – *i.e.*, that the Loan Documents constitute valid agreements between the parties, that Plaintiff has been making payments due under the Loan, and that Carrillo alleges he has incurred damages as a result of Defendant's failure to apply the agreed-upon variable interest rate.[4]  Instead, the instant dispute stems from differing interpretations of Wells Fargo's obligations under the Loan Documents. Plaintiff argues that Defendant agreed to apply a lower interest rate to the principal in the first year of repayment, but then failed to abide by that promise, *see generally* Pltf.'s Opp., whereas Defendant contends that the Loan Documents merely called for a reduced monthly payment in year one.  *See generally* Def.'s Mem.

Ordinarily, a written contract "should as a rule be enforced according to its terms."  *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 443 (1990).  Thus, "words and phrases are given their plain meaning" such that an

---

[3] Neither party has made a choice of law argument with respect to the breach of contract claim, nor is it evident from the Loan Documents whether a contractual provision to that effect exists.  Notably, however, in their briefing, both sides appear to have assumed that New York law should apply to the breach of contract cause of action, and so the Court interprets this claim thereunder.  *See Jin Young Chung v. Yoko Sano*, No. 10-cv-2301, 2011 WL 1303292, at *7 (E.D.N.Y. Feb. 25, 2011) (applying New York law where plaintiff "[did] not take[ ] any position" and the defendant defaulted), *report and recommendation adopted sub nom.*, 2011 WL 1298891 (E.D.N.Y. Mar. 31, 2011); *see also Mangual v. Pleas*, No. 02-cv-8311, 2005 WL 2179083, at *2 n.1 (S.D.N.Y. Sept. 8, 2005) (noting that where the parties do not raise choice-of-law as an issue, "it can be said that they have consented to the application of the forum state's law").

[4] Plaintiff alleges that his outstanding principal heading into the second year of the term was $478.13 higher than it should have been and, in turn, that this inflated balance will cost him $1,471.00 in excess interest over the life of the Loan.  *See* Pltf.'s Opp. at 4; *see also* FAC ¶¶ 40, 45.

agreement is "construed so as to give full meaning and effect to all of its provisions." *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) (citing *American Express Bank Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 277, 562 N.Y.S.2d 613, 614 (1st Dep't 1990), *appeal denied*, 77 N.Y.2d 807, 569 N.Y.S.2d 611 (1991) (internal quotations and brackets omitted). To that end, "it is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 816 (2d Cir. 2014) (quoting *W.W.W. Assocs., Inc.*, 77 N.Y.2d at 163, 565 N.Y.S.2d at 443 ("Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing") (collecting cases)). An agreement's language is clear-cut "if it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294-95 (2d Cir. 2015) (internal citation omitted).

Conversely, if an agreement's terms *are* ambiguous, courts "may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Bank of New York Tr. Co. v. Franklin Advisers, Inc.*, 726 F.3d 269, 276 (2d Cir. 2013) (internal citation omitted). A contract is ambiguous "if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 139 (2d Cir. 2000) (internal citation

omitted).  "Whether or not a writing is ambiguous is a question of law to be resolved by the courts."  *Orlander*, 802 F.3d at 294 (internal quotation and citation omitted). Further, "[t]he law is clear that ambiguities in a written contract are to be construed against the drafter."  *Al Sayegh Bros. Trading LLC v. Doral Trading & Exp., Inc.*, 219 F. Supp. 2d 285, 292 (E.D.N.Y. 2002) (citing *McCarthy v. Am. Int'l Group, Inc.,* 283 F.3d 121, 124 (2d Cir. 2002)).  When an agreement is unclear within the context under which a suit is brought, "a court has insufficient data to dismiss a complaint for failure to state a claim."  *Orlander*, 802 F.3d at 294-95.

Applying this standard, the Court concludes that the FAC's allegations, coupled with the Loan Documents, present ambiguities such that the Court is unable to interpret the agreements on a motion to dismiss.  Specifically, it is unclear from the language in the Buydown Agreement whether the parties agreed that interest would accrue at a flat rate of 3.875% throughout the Loan's term, or if a variable rate was applicable whereby the interest rate was initially 2.875%, increasing to 3.875% in the second year of repayment.  *Compare* Pltf.'s Opp. at 14-16; FAC ¶¶ 4, 5, 34, 38, 40, *with* Def.'s Mem. at 5-6; Def.'s Reply at 2-6; *see also* Buydown Agreement. Moreover, even if the Buydown Agreement decidedly reflects a fixed rate of 3.875% – which the Court concludes it does not – the Closing Disclosure presents uncertainty that cannot be ignored.  The Closing Disclosure, which represents a "statement of final loan terms" states in large font on the first page under "Loan Terms" that the "Interest Rate" is 2.875%, and then in significantly smaller font, that "starting in year 2" the rate can adjust to "as high as 3.875%."  *See* Closing Disclosure at 1.  That same

variable interest rate is reiterated in the AIR Table. *See id*. at 4. Assuming *arguendo* that the Loan Documents are ultimately construed to reflect the variable interest rate referred to by Plaintiff, his allegations that Wells Fargo merely reduced the monthly payments in the first year, while continuing to apply the higher interest rate throughout, amount to a plausible claim for breach of contract. *See* Pltf.'s Opp. at 14-17; FAC ¶¶ 4, 5, 34, 38, 40.

In arguing that dismissal is warranted, Wells Fargo contends that the Loan Documents unequivocally reflect a fixed interest rate of 3.875% and that the Buydown Agreement was intended solely to reduce the monthly payments in the first year. *See* Def.'s Mem. at 5-6; *see also* Def.'s Reply at 2-6. According to Defendant, the Buydown *Rate* merely serves to demonstrate that the reduced monthly payments in the first year reflect what the Loan would be amortized at *if* the interest rate was 2.875%, but that there was never a promise to *apply interest* at that stated percentage. *See id*. In support of this contention, Defendant points to language in the Buydown Payment Schedule stating that "[t]he note will bear an interest rate of 3.875% …" *See id*. The Court finds this argument unavailing. As discussed above, the Buydown Agreement is ambiguous on its face, and it does not provide clear support for Wells Fargo's interpretation of the Buydown Rate. *See* Buydown Agreement. Further, the fact that the Buydown Rate is shown as a percentage implies that a lower interest rate is in effect. *See* Buydown Payment Schedule.

Insofar as Wells Fargo intended its reading of the contract, the Loan Documents belie such a conclusion.[5]

The Court further rejects Defendant's argument that the Loan Documents' lack of language discussing amortization renders Plaintiff's interpretation of the agreements one that would result in a "double benefit" of both an interest reduction and a re-amortization of the Loan. *See* Def.'s Mem. at 4-5; *see also* Def.'s Reply at 2-4. The amortization of any loan is axiomatic to the interest being charged, in that the repayment calculation is necessarily derived from the interest accruing on the principal. In other words, the monthly payments on the Loan are inextricably linked to the interest rate. Thus, regardless of any explicit agreement as to how the payments would be structured, Wells Fargo was under an obligation to calculate the amortization in a manner that comported with the agreed-upon interest rate.

Defendant further claims that the buydown deposit was intended to be applied to only a part of the interest portion of the total mortgage payment. *See* Def.'s Reply at 4. This argument, however, is irrelevant. Plaintiff is not complaining about how the deposit was *apportioned*. Simply put, the Amended Complaint is merely alleging that Wells Fargo applied a higher interest rate on his Loan than the parties agreed to. Accordingly, the Court finds that the FAC states a viable cause of action for breach

---

[5] To that end, Wells Fargo's argument that the Buydown Agreement "shall [not] be construed to contradict the Note or Mortgage, and in the event of any conflict, the Note or Mortgage shall prevail," *see* Def.'s Mem at 5 (citing Buydown Agreement ¶ 11), is similarly rejected. As discussed above, the Note and Mortgage were not attached to the FAC, and so the Court has not reviewed those documents. The Closing Disclosure, however, purports to summarize the terms of the Loan. *See* Closing Disclosure at 1. Thus, even if the Buydown Agreement were deemed overridden, the Closing Disclosure also lends support to Plaintiff's interpretation.

of contract, and respectfully recommends denying Defendant's Motion seeking to dismiss this claim.[6]

b.    *New York General Business Law § 349*

The Court next concludes that the Amended Complaint sufficiently states a claim for a violation of GBL Section 349, which prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. Gen. Bus. Law § 349(a). "To state a claim for a § 349 violation, 'a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'" *See Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 124 (2d Cir. 2017) (quoting *City of New York v. Smokes-Spirits.Com, Inc.*, 12 N.Y.3d 616, 621, 883 N.Y.S.2d 772, 776 (2009)). Wells Fargo argues that the FAC fails to plead each of the requisite elements. *See* Def.'s Mem. at 7-10. The Court disagrees.

---

[6] Although not pled as a separate cause of action, the FAC asserts that the breach of contract claim "includ[es] a breach of the covenant of good faith and fair dealing." *See* FAC, Second Cause of Action. In New York, "a covenant of good faith and fair dealing is implied in every contract." *Donnenfeld v. Petro, Inc.*, 333 F. Supp. 3d 208, 220 (E.D.N.Y. 2018) (citing *Payday Advance Plus, Inc. v. Findwhat.com, Inc.*, 478 F. Supp. 2d 496, 503 (S.D.N.Y. 2007). Thus, a breach of this implied covenant is itself considered a breach of contract, and a complaint containing both claims is redundant as a matter of law. *See Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002). Here, the breach of the implied covenant of good faith and fair dealing is not pled as a separate cause of action, and so the Court declines to recommend dismissal of this claim as duplicative. Moreover, Carrillo's contentions concerning Wells Fargo's implicit agreement to amortize the Loan in a manner consistent with the agreed-upon interest rate sufficiently asserts that Defendant's breach of contract encompasses a breach of this accompanying covenant. *See Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir 2006) (The covenant of good faith and fair dealing "applies where an implied promise is so interwoven into the contract 'as to be necessary for effectuation of the purposes of the contract.'") (internal quotation and citation omitted).

13

(1)    Consumer-Oriented Conduct

"Conduct is 'consumer oriented' under the GBL if it 'has a broader impact on consumers at large' as opposed to on just the plaintiff." *Donnenfeld*, 333 F. Supp. 3d at 222 (quoting *Shapiro v. Berkshire Life Ins. Co.*, 212 F.3d 121, 126 (2d Cir. 2000)). "This requirement has been broadly interpreted, and is met so long as the conduct at issue can potentially affect similarly situated consumers." *Id.* (citing *Koch v. Greenberg*, 626 F. App'x 335, 340 (2d Cir. 2015) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 26-27, 623 N.Y.S.2d 529 1995))) (internal quotations omitted).

Defendant argues that Plaintiff's claim arises under an individualized contract dispute, rather than being related to broad consumer-oriented conduct, and also that Carrillo's allegations regarding this element are conclusory. *See* Def.'s Mem. at 7-8. The FAC, however, alleges more than just a personal grievance, and instead asserts that Wells Fargo regularly markets and offers boilerplate buydown agreements (that purportedly promise a lower initial interest rate than is charged) similar to Carrillo's, in connection with issuing hundreds of thousands of residential loans annually. *See* FAC ¶¶ 15, 17, 52, 55, 73. These contentions are not merely threadbare recitals of Section 349, but instead reflect specific factual allegations directed at wide-ranging deceptive conduct. Courts in this Circuit have found similar actions to be violative of the GBL. *M & T Mortg. Corp. v. White*, denying summary judgment seeking to dismiss a Section 349 claim, is instructive:

> The court is not willing to find as a matter of law that a
> purchase of a home and accompanying mortgage cannot be

14

> harmful to the public interest generally and therefore
> cannot be sufficiently consumer-oriented to comply with
> the statute…. On the contrary, such practice could easily
> recur and could potentially impact similarly situated
> consumers and therefore be considered consumer-oriented
> and harmful to the public at large…. While the deceptive
> practices were aimed at particular individuals in these
> instances, nothing suggests that similarly vulnerable
> consumers could not — and did not — fall victim to similar
> practices, and there is nothing especially unique or
> unusual about these particular transactions.

736 F. Supp. 2d 538, 571 (E.D.N.Y. 2010) (internal quotations and citations omitted); *accord Kapsis v. Am. Home Mortg. Servicing Inc.*, 923 F. Supp. 2d 430, 449 (E.D.N.Y. 2013) (denying motion to dismiss Section 349 claim where the complaint alleged a mortgage servicer's purportedly deceptive practices were directed to a potential class of tens-of-thousands of individuals); *see also Interested Underwriters at Lloyd's of London Subscribing to Policy No. 991361018 v. Church Loans & Investments Tr.*, 432 F. Supp. 2d 330, 334 (S.D.N.Y. 2006) (denying motion to dismiss a Section 349 complaint alleging that the defendant issued boilerplate contracts, noting that "[d]ecisions from New York Appellate Division courts have emphasized that standard agreements and policies are significant in showing that challenged actions are consumer-oriented") (internal citations omitted). Accordingly, Carrillo has adequately alleged that Wells Fargo's conduct is consumer-oriented.

(2)    Materially Misleading Conduct

As to the second element, "[t]he New York Court of Appeals has adopted an objective definition of 'misleading,' under which the alleged act must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007) (quoting *Oswego*

15

*Laborers' Local 214 Pension Fund*, 85 N.Y.2d at 26, 623 N.Y.S.2d at 532-33). "Courts have generally held that since [the materially misleading conduct] factor requires a reasonableness analysis [best suited for a jury], it cannot be resolved on a motion to dismiss." *Buonasera v. Honest Co., Inc.*, 208 F. Supp. 3d 555, 566 (S.D.N.Y. 2016) (collecting cases).

Here, the Amended Complaint sufficiently alleges that Wells Fargo's lending practices are likely to mislead reasonable consumers. Specifically, Carrillo claims that Wells Fargo offers its customers buydown agreements that promise a reduced interest rate on their mortgage loans in the first year of repayment, but then amortizes the payments by applying a higher rate from the onset. *See, e.g.,* FAC ¶¶ 38, 40, 71. Moreover, as discussed above, the Loan Documents are ambiguous in that the contracts indicate that a reduced interest rate will indeed be applied to the principal during the initial period such that a reasonable consumer could be misled as to the Loan Documents' intention. Rather than disputing the purportedly misleading interest representations contained in the Loan Documents, Defendant focuses on the Closing Disclosure's lack of an amortization schedule. *See* Def.'s Mem. at 9, n. 1. This argument lacks merit. As set forth above, the amortization schedule is derived from the interest rate being applied to the Loan, and so is necessarily dependent on the rate being charged. Plaintiff is not alleging that Wells Fargo misrepresented how it would amortize the loan, but rather claims that the repayments were improperly structured as a result of Defendant's failure to apply

the interest rate promised.  Accordingly, the FAC sufficiently pleads materially misleading conduct under the statute.

### (3)    Injury

Finally, Defendant contends that Plaintiff has failed to establish the third element because he has not pled an injury independent from his breach of contract claim.  *See* Def.'s Mem. at 10.  In making this argument, Wells Fargo points to *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009).  Defendant's reliance on *Spagnola*, however, is misplaced.  In *Nick's Garage v. Progressive Cas. Ins. Co.*, the Second Circuit later articulated that *Spagnola* "found no GBL injury 'where the plaintiffs alleged damages in the amount of the purchase price of their contracts, but failed to allege that defendants had denied them the services for which they contracted.'"  875 F.3d at 124 (quoting *Orlander*, 802 F.3d at 302).  In fact, *Nick's Garage* emphasized that "no such broad requirement [that any monetary GBL injury must be independent of alleged breach of contract damages] exists under New York law." *Donnenfeld*, 333 F. Supp. at 224.  Thus, when a plaintiff alleges that he did not receive the full value of his purchase and *repeatedly overpaid* – based on alleged deceptive practices – that is sufficient to state a GBL claim independent from the breach of contract claim.  *See id*.  Similarly, the actual injury prong of Section 349 "may be satisfied through an allegation that a plaintiff ... paid a premium for a product based on the defendants' inaccurate representations."  *Greene v. Gerber Prod. Co.*, 262 F. Supp. 3d 38, 68 (E.D.N.Y. 2017) (internal quotations, citations, and brackets omitted).

Here, the FAC alleges that Wells Fargo's purported misleading conduct caused him to suffer damages in the form of Plaintiff's principal balance at the end of his first year of his repayment being $478.13 higher than advertised, resulting in an increased cost of $1,471.00 in interest over the life of the loan.  *See* FAC ¶ 45; Pltf.'s Opp. at 4.  Thus, Carrillo claims that he did not receive the benefit of his bargain (a reduced interest rate) with respect to the Buydown Agreement, which has resulted in him repeatedly being overcharged throughout the repayment term.  Accordingly, Plaintiff's claim for damages is viable, and the Court respectfully recommends denying Defendant's Motion insofar as it seeks to dismiss Carrillo's GBL Section 349 cause of action.

### c.    *Truth in Lending Act*

Finally, the Court concludes that the FAC states a plausible claim under TILA. The purpose of the Act is to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit."  15 U.S.C. § 1601.  As a result, "creditors [are required] to provide borrowers with clear and accurate disclosures of terms dealing with things like … annual percentage rates of interest…."  *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412, 118 S. Ct. 1408, 1410 (1998); *see also Islam v. Lee's Motors, Inc.*, No. 17-cv-3955, 2018 WL 4771884, at *3 (E.D.N.Y. Sept. 30, 2018) (quoting *Bonanno v. Sec. Atl. Mortg. Co.*, No. 07-cv-4071, 2010 WL 2134155, at *5 (E.D.N.Y. May 26, 2010)).  Specifically, Section 1638 of TILA provides that lenders

who extend variable-rate extensions of credit "secured by the dwelling of a consumer" (*i.e.*, mortgages) must make disclosures that,

> [s]tate in conspicuous type size and format *examples of adjustments to the regular required payment on the extension of credit based on the change in the interest rates specified by the contract* for such extension of credit. Among the examples required to be provided under this clause is an example that reflects the maximum payment amount of the regular required payments on the extension of credit, based on the maximum interest rate allowed under the contract, in accordance with the rules of the Bureau [of Consumer Financial Protection].

15 U.S.C. § 1638(b)(2)(C)(ii) (emphasis added).

Wells Fargo's principal argument in support of dismissing the TILA claim is that it is derivative of Carrillo's other causes of action, and therefore fails for similar reasons. *See* Def.'s Mem. at 11-12; *see also* Def.'s Reply at 12 ("[Plaintiff's TILA claim] fails for similar reasons as his contract and GBL claims"). The Court reaches the opposite conclusion – namely, that Carrillo's TILA cause of action is plausible for many of the reasons that the other claims are viable. Specifically, the same misleading ambiguities relevant to the contractual and GBL causes of action may render the Loan Documents an inaccurate reflection of the credit being extended. The Loan Documents' apparent representation that Carrillo would be charged a 2.875% interest rate in his first year of repayment, when the rate being applied was 3.875%, potentially renders the Closing Disclosure an erroneous representation of the Loan's terms. Thus, although the Loan Documents appear to state the "examples of adjustments to the regular required payment," these alterations are not in fact "based on the change in the interest rates specified by the contract," as required by the

19

statute.  15 U.S.C. § 1638(b)(2)(C)(ii).  Instead, the reduced monthly payments in the first year merely account for the prorated deposit being applied.  Accordingly, Carrillo has plausibly stated a claim under TILA, and the Court respectfully recommends denying Wells Fargo's Motion to dismiss each of the FAC's three causes of action.

### B.   Motion to Strike Class Allegations

Having determined that Plaintiff has viably pled the three claims asserted in the Amended Complaint, the Court turns to whether the class allegations should be stricken.  The FAC seeks to establish three putative classes – one for each cause of action.  *See* FAC ¶¶ 48-50.  The Court concludes that it is premature to strike these allegations.

Wells Fargo moves to strike the FAC's class allegations pursuant to Fed. R. Civ. P. 12(f) and 23(d)(1)(D), arguing that Plaintiff fails to satisfy Rule 23's pleading requirements.  *See generally* Def.'s Mem. at 12-23.  Rule 12(f) permits courts to "strike from a pleading … any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  Similarly, Rule 23(d)(1)(D) authorizes courts to "issue orders that … require the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly."  Fed. R. Civ. P. 23(d)(1)(D).  "Courts rarely grant motions to strike pursuant to [Rule 12(f)]." *Belfiore v. Procter & Gamble Co.*, 94 F. Supp. 3d 440, 447 (E.D.N.Y. 2015) (citing *McKinney v. Dzurenda*, No. 10-cv-880, 2013 WL 1296468, at *1 (D. Conn. Mar. 27, 2013) (collecting cases)); *see also Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 511 (S.D.N.Y. 2015) ("[m]otions to strike under Rule 12(f) are rarely successful").  Further,

motions to strike directed specifically at class allegations on a motion to dismiss are "disfavored" because they require the Court to "preemptively terminate the class aspects of litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification." *Belfiore*, 94 F. Supp. 3d at 447 (internal citations omitted).

Thus, "to succeed on a motion to strike class allegations, a defendant must demonstrate from the face of the complaint that it would be impossible to certify the alleged class regardless of the facts that plaintiffs may be able to obtain during discovery." *Reynolds*, 136 F. Supp. 3d at 511 (internal quotations, citations, and brackets omitted). Instead, "courts in this Circuit have repeatedly held [that] a determination of whether the Rule 23 requirements are met is more properly deferred to the class certification stage, when a more complete factual record can aid the Court in making this determination." *Greene*, 262 F. Supp. 3d 38 at 79 (E.D.N.Y. 2017) (collecting cases) (internal quotations omitted); *see also Mazzola v. Roomster Corp.*, 849 F. Supp. 2d 395, 410 (S.D.N.Y. 2012) (courts in the Second Circuit "have frequently found that a determination of whether the Rule 23 requirements are met is more properly deferred to the class certification stage, when a more complete factual record can aid the Court in making this determination") (collecting cases). As a result, "motions to strike class allegations are often denied as premature." *Reynolds*, 136 F. Supp. 3d at 511-12 (internal citations omitted). "An exception to this general rule applies, however, when a motion to strike 'addresses issues separate

and apart from the issues that will be decided on a class certification motion.'" *Id.* at 512 (quoting *Chen-Oster v. Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012)).

As an initial matter, the Court notes that Carrillo has not yet moved for class certification pursuant to Rule 23(c), and indeed such a motion at this stage of the litigation, before any discovery has been conducted, would be premature. As a result, the Court concludes that the issues raised in Defendant's motion to strike are unripe. Accordingly, the Court respectfully recommends denying this portion of Defendant's Motion. Nevertheless, the Court conducts a preliminary assessment of this action's Rule 23 viability.

i.    <u>Rule 23(a)</u>

First, Defendant argues that the class allegations should be stricken because the FAC fails to establish that Rule 23(a)'s prerequisites of numerosity, commonality, typicality, and adequacy. *See* Def.'s Mem. at 14; Def.'s Reply at 2 (Plaintiff "alleges no facts from which the Court could conclude class treatment is or could be appropriate"); *see also* Fed. R. Civ. P. 23(a). The Court disagrees and addresses each factor in turn.

a.    *Rule 23(a)(1): Numerosity*

The first Rule 23(a) requirement is that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In determining whether plaintiffs have satisfied Rule 23's numerosity requirement, courts conduct a "case-by-case analysis of the facts[.]" *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 99

(E.D.N.Y. 2012). Within the Second Circuit, "numerosity is presumed at a level of 40 members." *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *Gortat v. Capala Bros.*, 949 F.Supp.2d 374, 383 (E.D.N.Y. 2013). [A] plaintiff need not present a precise calculation of the number of class members and it is permissible for the court to rely on reasonable inferences drawn from available facts[.]" *Hill v. City of New York*, 136 F.Supp.3d 304, 353 (E.D.N.Y. 2015). Relevant considerations as to the practicability of joinder include "judicial economy arising from the avoidance of a multiplicity of actions, ... financial resources of class members, [and] the ability of claimants to institute individual suits." *Balverde v. Lunella Ristorante, Inc.*, No. 15-cv-5518, 2017 WL 1954934, at *5 (S.D.N.Y. May 10, 2017) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)).

Here, Carrillo alleges that Wells Fargo makes "hundreds of thousands of residential loans every year and … regularly originates temporary payment reduction … products … including rate buydown products of the type at issue in this case." FAC ¶ 52. Moreover, Plaintiff claims that the "rate buydown program at issue in this case has been offered to the general public and each class set forth [in the FAC] includes hundreds, if not thousands, of consumers." Thus, despite Defendant's contention that the Amended Complaint merely contains conclusory allegations, *see* Def.'s Mem. at 16, the Court concludes that Carrillo has sufficiently pled that each putative class will have more than 40 members and that joinder would otherwise be impractical.

b.    *Rule 23(a)(2): Commonality*

The second Rule 23(a) requirement is that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Plaintiff must establish that class members have "suffered the same injury" and that their claims "depend upon a a common contention ... of such a nature that it is capable of class-wide resolution." *Sykes v. Mel S. Harris and Associates LLC*, 780 F.3d 70, 80 (2d Cir. 2015) (internal quotation and citation omitted). "A court may find a common issue of law even though there exists 'some factual variation among class members' specific grievances....'" *Han v. Sterling Nat'l Mortg. Co.*, No. 09-cv-5589, 2011 WL 4344235, at *3 (E.D.N.Y. Sept. 14, 2011) (quoting *In re Playmobil Antitrust Litig.*, 35 F.Supp.2d at 231, 240 (E.D.N.Y. 1998)). "The commonality requirement may [therefore] be met when individual circumstances of class members differ, but their injuries derive from a unitary course of conduct." *Id.* (internal quotation and citation omitted). A key factor in the commonality assessment is a class-wide proceeding's ability to generate common *answers* to questions at stake in the litigation. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 2551 (2011) (internal citation omitted).

Here, the FAC alleges that common questions exist between Plaintiff's claims and the putative classes' claims, including, *inter alia*, whether Wells Fargo consistently: (i) improperly amortizes loans involving rate buydowns by applying a greater interest rate than promised; and (ii) obscures the nature of their mortgage transactions through vague and inaccurate written contracts. *See, e.g.,* FAC ¶ 59. Thus, Carrillo asserts a plausible claim that the putative classes have suffered the

same injuries, *i.e.*, being charged a greater than agreed-upon interest rate on their mortgage loans.  Moreover, even if some factual variation exists between the specific terms of the class members' loans, an ultimate finding that Wells Fargo is charging its customers interest rates that differ from the agreements at issue is likely to answer common questions of law concerning whether Defendant is liable for the various causes of action asserted.

c.      *Rule 23(a)(3): Typicality*

The third Rule 23(a) requirement is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  This "'requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'"  *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 164 (S.D.N.Y. 2014) (quoting *Robidoux*, 987 F.2d at 936).  "Rule 23(a)(3) requires only that the disputed issues of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class."  *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 406 (S.D.N.Y. 2015) (internal quotation and citation omitted).  Typicality is "not highly demanding."  *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 155 (S.D.N.Y. 2002) (internal quotation and citation omitted).  As a practical matter, the typicality requirement tends to merge with the commonality requirement "because [b]oth serve as guideposts for determining whether ... the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their

absence." *General Telephone Co. v. Falcon*, 457 U.S. 147, 157 n.13, 102 S. Ct. 2364, 2371 (1982).

Here, the Amended Complaint sufficiently pleads typicality. *See e.g.*, FAC ¶¶ 59-61. Namely, each of the three putative class members' claims are alleged to have arisen from the same general course of events (*i.e.*, having a mortgage loan that accrues interest at a higher rate than promised). Defendant contends that Plaintiff's claims are not typical of the putative classes because "whether Wells Fargo purportedly breached its contract or made supposedly deceptive representations in particular buydown agreements or loan documents is an individualized question depending on the content of the disclosures and contracts with *each* putative class member." Def.'s Mem. at 18 (emphasis in original). This argument once again misses the mark. Carrillo alleges that the buydown agreements at issue are "boilerplate documents," FAC ¶ 52, and so if it comes to light during discovery that Wells Fargo routinely fails to adjust its interest rate, and an eventual determination is made that a variable interest rate was indeed agreed upon, it may be so that Defendant is liable to the entire class for engaging in the same unlawful conduct repeatedly. Accordingly, the class allegations should not be stricken for lack of typicality.

### d.    *Rule 23(a)(4): Adequacy*

Finally, Rule 23(a) requires that the proposed class representatives will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy of representation entails an inquiry as to whether: "plaintiff's interests are antagonistic to the interests of other members of the class." *Baffa v. Donaldson,*

*Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).  "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent."  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625, 117 S.Ct. 2231, 2250 (1997).

Here, there is no apparent reason why Carrillo's interests would be at odds with any of the putative class members.  Defendant argues that Plaintiff is not similarly situated to other proposed members by virtue of only his loan being purportedly promised to be amortized at a particular rate.  *See* Def.'s Mem. at 19.  On the contrary, however, the initial inquiry will merely be whether other customers of Wells Fargo's mortgage loan program had buydown agreements that promised a lower interest rate than charged.  If, as discovery progresses, it becomes apparent that Plaintiff's position differs from other potential class members, the Court can assess that situation when considering the class certification motion.  Accordingly, the FAC sufficiently alleges the Rule 23(a) prerequisites.

ii.   Rule 23(b)

Wells Fargo next argues that the class allegations should be stricken because the claims do not fall into any of the categories contemplated by Rule 23(b).  *See* Def.'s Mem. at 19-23; *see also* Fed. R. Civ. P. 23(b) (defining the types of class action suits that can be maintained).  The Court similarly rejects this contention.

In addition to demonstrating the Rule 23(a) prerequisites, if Carrillo eventually moves for class certification, the Court will also have to determine whether the proposed classes are "maintainable to one of the subsections of Rule 23(b)."  *Perez*

*v. Allstate Ins. Co.*, No. 11-cv-1812, 2014 WL 4635745, at *13 (E.D.N.Y. Sept. 16, 2014) (internal quotation and citation omitted); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 34, 133 S. Ct. 1426, 1432 (2013) (noting that, in addition to satisfying Rule 23(a)'s requirements, a party "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)").

As with the Rule 23(a) analysis, it is premature, absent the benefit of discovery, to determine whether any of the Rule 23(b) categories can be established. The FAC, however, contains enough factual substantiation to prevent striking the class allegations at this stage. Plaintiff indicates that the putative classes are most likely to be maintained under Rule 23(b)(3). *See* Pltf.'s Opp. at 22-25. A party seeking certification of a Rule 23(b)(3) class must establish that: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). A plaintiff need not, however, prove these factors prior to discovery. *See Med. Soc'y of New York v. UnitedHealth Grp. Inc.*, No. 16-cv-5265, 2018 WL 1773142, at *2 (S.D.N.Y. Apr. 12, 2018) (denying motion to strike class allegations as premature because, among other things, "[w]hether questions common to the class predominate over individualized issues is precisely the sort of determination that the Court would make at the class certification stage").

Here, the Court is satisfied that the FAC renders eventual certification under Rule 23(b) plausible. As discussed above, there appears to be several common

questions of law and fact between Plaintiff's claims and the putative classes', including, among other things, whether:  (i) the mortgagors entered into buydown agreements; (ii) such contracts called for variable interest rates; and (iii) Wells Fargo applied the proper rates.  Further, the pecuniary damages claimed by Carrillo are relatively small, as he alleges that Defendant's conduct caused his principal at the end of the first year of his repayment to be $478.13 higher than it should have been, resulting in an increased cost of $1,471.00 over the life of the loan.  *See* FAC ¶ 45; Pltf.'s Opp. at 4.  If the other potentially affected individuals were damaged in a similar fashion, it would be cost prohibitive for each mortgagor to bring an individual suit.  Thus, class litigation appears to be the most efficient way to adjudicate this controversy.  Accordingly, the Court concludes that it is plausible that this litigation is encompassed by Rule 23(b)(3).[7]

### iii.  "Fail-Safe" Classes

Finally, Wells Fargo maintains that the proposed classes are impermissible "fail-safe" classes.  *See* Def.'s Mem. at 14-15.  This argument is also unavailing.  A "fail-safe" class is one whose definition limits putative class members to those entitled to relief and therefore, the class members can only be known after a determination of liability.  *See Marin v. Apple-Metro, Inc.*, No. 12-cv-5274, 2017 WL 4950009, at *37 (E.D.N.Y. Oct. 4, 2017) ("A fail-safe class is one whose definition shields the putative

---

[7] Plaintiff also suggests the putative classes may be certified under Rule 23(b)(1) or (2).  *See* Pltf.'s Mem. at 25.  Defendant argues that these categories are also unsustainable.  *See* Def.'s Mem. at 19-20.  Because the issues surrounding these categories are also tied into the questions that will be presented in the class certification motion, and because Carrillo has established that, at a minimum, Rule 23(b)(3) classification may be appropriate, the Court need not address the applicability of the remaining subcategories in detail at this time.

class members from receiving an adverse judgment.... In other words, in a fail-safe class, either the class members win or, by virtue of losing, they are not in the class, and therefore not bound by the judgment.") (internal quotation and citation omitted). Courts should not certify a proposed "fail-safe" class because they are: (1) unfair to defendants; (2) prevent an adverse judgment being entered against plaintiffs; and (3) are unmanageable because the members of the class could only be known after a determination of liability. *See Spread Enterprises, Inc. v. First Data Merch. Servs. Corp.*, 298 F.R.D. 54, 69 (E.D.N.Y. 2014) (internal quotation and citation omitted). In *Spread Enterprises*, class certification was rejected in light of a class definition that included merchant customers who were "charged excessive fees" for transactions under a processing agreement. *Id.* Thus, certifying the class in that instance would have necessarily determined liability by deeming the processing fees excessive. *Id.*

Conversely, here, preliminary class discovery can be conducted absent a determination of Wells Fargo's liability. Specifically, the parties can engage in factfinding to determine the scope and reach of Defendant's buydown program. If, after the record is developed, it remains unclear whether Wells Fargo charged each of those customers different interest rates than purportedly promised, then it may be impracticable to certify one or more of the proposed classes. An initial assessment, however, indicates that Defendant readily admits applying interest rates higher than the buydown rates, and instead takes the position that the contracts at issue call for such an interpretation. Thus, it is possible that classes get certified for those customers who entered buydown agreements, and then a determination is made that

none of those contracts required Wells Fargo to apply a reduced interest rate in the first year. In that case, liability could be determined after certification. Accordingly, Defendant has failed to show that the putative classes are impermissible "fail-safe" classes such that class discovery should be prohibited, and the Court respectfully recommends denying Defendant's Motion to strike the FAC's class allegations.[8]

## III.   Conclusion

For the reasons set forth above, the Court respectfully recommends denying Defendant's Motion in its entirety.

## IV.   Objections

A copy of this Report and Recommendation is being served on all parties by electronic filing on the date below. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a); *Ferrer v. Woliver*, 05-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated:    Central Islip, New York
          May 10, 2019                    /s/ Steven I. Locke
                                          STEVEN I. LOCKE
                                          United States Magistrate Judge

---

[8] It is worth noting that courts have the discretion, at the certification stage, to redefine classes to bring them within the scope of Rule 23. *Spread Enterprises*, 298 F.R.D. at 70 (collecting cases). Thus, if needed, the Court could ultimately shift the class definitions at the appropriate juncture.