UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

ALEJANDRO CARRILLO, individually and
on behalf of all others similarly situated,

            Plaintiff,

   v.

WELLS FARGO BANK, N.A.,

            Defendant.

NO. 2:18-cv-03095-SJF-SIL

**PLAINTIFF'S RESPONSE TO
DEFENDANT WELLS FARGO BANK,
N.A.'S OBJECTIONS TO MAGISTRATE
JUDGE'S REPORT AND
RECOMMENDATION**

**TABLE OF CONTENTS**

**Page No.**

I.    INTRODUCTION………………………………………………………......1

II.   STATEMENT OF FACTS………………………………………………......2

III.  ARGUMENT…………………………………………………………......5

    A.    Standard of Review……………………………………………......5

    B.    Magistrate Judge Locke Correctly Upheld the Contract Claims Because the

    Buydown Agreement is Ambiguous……………………………………......6

    C.    Magistrate Judge Locke Correctly Upheld Mr. Carrillo's GBL §349 Claim........13

        1.    Wells Fargo's conduct is consumer oriented…………………......13

        2.    Wells Fargo's conduct is materially misleading………………….......19

    D.    Magistrate Judge Locke Correctly Upheld Mr. Carrillo's TILA Claim……......20

IV.  CONCLUSION…………………………………………………………..22

# TABLE OF AUTHORITIES

**Page No.**

## FEDERAL CASES

*Alvarez Sosa v. Barr*,
    369 F. Supp. 3d 492 (E.D.N.Y. 2019)………………………………………………5-6

*Bank of New York Tr. Co. v. Franklin Advisers, Inc.*,
    726 F.3d 269 (2d Cir. 2013)……………………………………………………..6

*Chiari v. New York Racing Ass'n Inc.*,
    972 F. Supp. 2d 346 (E.DN.Y. 2013)………………………………………..………5

*Farmer v. Camden City Bd. of Educ.*,
    No. CIV. 03-685JBS, 2005 WL 1683745 (D.N.J. July 19, 2005)………………………14

*H&H Envtl. Sys., Inc. v. Evanston Ins. Co.*,
    No. 6:18-CV-06315 EAW, 2019 WL 1129434 (W.D.N.Y. Mar. 12, 2019)……………17

*Harris v. TD Ameritrade*,
    338 F. Supp. 3d 170 (S.D.N.Y. 2018)…………………………………………………5

*Hinds v. Dallas Indep. Sch. Dist.*,
    188 F. Supp. 2d 664 (N.D. Tex. 2002)………………………………………………..14

*Holland Loader Co., LLC v. FLSMIDTH A/S*,
    313 F. Supp. 3d 447 (S.D.N.Y. 2018)…………………………………………………9

*Interested Underwriters at Lloyd's of London Subscribing to Policy No.*
    *991361018 v. Church Loans & Investments Tr.*,
    432 F. Supp. 2d 330 (S.D.N.Y. 2006)……………………………………………....16

*Kapsis v. Am. Home Mortg. Servicing, Inc.*,
    923 F. Supp. 2d 430 (E.D.N.Y 2013)………………………………………..……..14

*M & T Mortg. Corp. v. White*,
    736 F. Supp. 2d 538 (E.D.N.Y. 2010)…………………………………………....14

*McCarthy v. Am. Intern. Grp., Inc.*,
    283 F.3d 121 (2d Cir. 2002)……………………………………………………...7

*Orlander v. Staples*,
    802 F.3d 289 (2d Cir. 2015)……………………………………………..……..6

*RCJV Holdings, Inc. v. Collado Ryerson, S.A. de C.V.*,
    18 F. Supp. 3d 534 (S.D.N.Y. 2014)……………………………………………..11-12

## STATE CASES

*Disa Realty, Inc. v. Rao*,
    168 A.D.3d 1037 (N.Y. App. Div. 2019)…………………………………..……18

*In re Lipper Holdings, LLC*,
    1 A.D. 3d 170 (1st Dep't 2003)………………………………………………….8

*Platek v. Town of Hamburg*,
    26 N.E.3d 1167 (N.Y. 2015)……………………………………………………11

*Seller v. Citimortgage, Inc.*,
    118 A.D.3d 511 (N.Y. App. Div. 2014)…………………………………………19

*Village of Ilion v. County of Herkimer*,
    18 N.E.3d 359 (N.Y. 2014)………………………………………………………7

## FEDERAL STATUTES

15 U.S.C. § 1601…………………………………………………………………………20

# I. INTRODUCTION

This case involves a clever, but unlawful, scheme by Wells Fargo that causes borrowers to pay more to Wells Fargo than they should. Using standardized loan documents, Wells Fargo markets certain mortgage loan products by touting a reduced introductory interest rate to draw borrowers to accept its mortgage product. Wells Fargo promotes the loans with a "buydown rate" in which the borrower will pay a lower interest rate for the first year of the loan than throughout the remaining term. But Wells Fargo fails to deliver the promised introductory interest rate. Once the loan has closed, Wells Fargo treats the introductory "rate" it promised as referring only to the amount the customer will pay out of pocket each month – not the interest rate it will charge on the mortgage. It treats the loan as carrying the same interest rate in the first year as during the rest of the term but accepts lower payments. The borrower ultimately pays more interest and reduces the loan principal less than if Wells Fargo had in fact applied the lower rate to the first year of the loan as it promised. Wells Fargo does not dispute that it fails to use the lower interest rate. It instead argues that the loan documents make it clear that its introductory "rate" refers only to introductory payments for the first year.

But as Magistrate Judge Locke recognized in a thorough Report and Recommendation ("Report") running thirty-one pages long rejecting Wells Fargo's motion in its entirety, the loan documents are ambiguous. Report at 10. And as the Report correctly noted, the Closing Disclosure provided to Plaintiff by Wells Fargo "which represents 'a statement of final loan terms' states in large font on the first page under 'Loan Terms' that the 'Interest Rate' is 2.875%" in year one and subsequently adjusts 'as high as 3.875%'" in year two of the loan. *Id*. (quoting Closing Disclosure).

In response to the Report, Wells Fargo reiterates the same arguments Magistrate Judge Locke rejected in adjudicating the motion to dismiss. Wells Fargo has not offered any basis for the Court to reject Magistrate Judge Locke's Report. Defendant's objections should be denied.

## II. STATEMENT OF FACTS

Wells Fargo is one of the largest originators of residential mortgages in the United States and it regularly markets rate buydown programs to consumers nationwide. FAC ¶¶15-17.[1] The loan documents and disclosures at issue in this case are boilerplate documents, and each proposed class includes hundreds if not thousands of consumers. *Id.* at ¶¶53, 55. *See* Report at 4, 22-23. The boilerplate buydown agreement Wells Fargo regularly uses, and that it used to originate Mr. Carrillo's mortgage, attaches a payment schedule that discloses a "buydown rate" for the first year of the loan that is lower than the interest rate for the remainder of the loan. Report at 2-3.

Wells Fargo provided Mr. Carrillo a form Closing Disclosure that describes itself as "a statement of final loan terms and closing costs" and that prominently states on page 1 that the "Interest Rate" for the loan is "2.875%," and that the loan "Adjusts every year starting in year 2" and "Goes as high as 3.875% in year 2," included an Adjustable Interest Rate Table ("AIR Table"). Consistent with the AIR Table, the Disclosure states that the Loan bears "an initial interest rate of 2.875%, which could be adjusted to a rate as high as 3.875% beginning in the second year of repayment." *Id.* at 2 (citing FAC ¶35 & Ex. A). The accompanying payment

---

[1] FAC "¶__" and Exs. A and B refer to the First Amended Class Action Complaint (ECF 17, 17-1 and 17-2, respectively).

schedule similarly states that the "Buydown Rate" in the first year is 2.875 percent (with a corresponding monthly payment of $597.45). *Id.* at 3. In a smaller font, the payment schedule states that the "note will bear an interest rate of 3.875% . . . ". *Id.* Both rates are listed as applying to the "1st Period" and as covering "P&I," i.e. principle and interest. FAC Ex. B at Ex. A. Based on these documents, Mr. Carrillo, like any reasonable consumer, expected that he would pay interest at the lower rate for the initial period (2.875 percent for the first year) and at the higher rate for the remainder of the loan (3.875 percent for the remaining 29 years). FAC ¶2.

Instead of using the 2.875 percent figure as an interest rate however, Wells Fargo used it only to set Mr. Carrillo's monthly payment. Despite its representations of a first year "buydown," Wells Fargo continued to amortize the loan at the higher interest rate of 3.875 percent during the first year. While Mr. Carrillo's monthly payment of $597.45 corresponds to a monthly payment amortized for 30 years at 2.875 percent interest, Wells Fargo continued to charge Mr. Carrillo 3.875 percent interest during the first year, for a corresponding monthly debt of $677.15.

As a result, Wells Fargo increased the loan principal owed by roughly $40 each month in the first year. Consequently, after making twelve full monthly payments under the terms stated in Wells Fargo's Closing Disclosure, in its Buydown Agreement, and as reflected in the AIR Table, Mr. Carrillo's principal balance owing was several hundred dollars higher than the documents led him to expect – all while paying additional amounts in interest.

Taking the first month of Mr. Carrillo's 30-year loan of $144,000 as an example, a 2.875 percent interest rate would result in a monthly payment of $597 ($345 interest payment and $252 towards principal). Instead, Wells Fargo amortized the loan at the rate of 3.875 percent, charging

Mr. Carrillo $465 in interest and $212 in principal for a monthly total of $677.[2]

The result is that Mr. Carrillo and other consumers do not receive the benefit of the lower interest rates they were promised and ultimately pay more interest each month, which Wells Fargo adds to their principle loan balance. This practice of adding the shortfall caused by an inflated interest rate will cost Mr. Carrillo an additional $1,471.00 in interest over the life of the loan. FAC ¶ 45.

Wells Fargo further obscured the way it intended to add to Mr. Carrillo's principal loan amount each month by including additional misleading and inaccurate provisions in its buydown agreement and closing disclosures. FAC ¶¶10-14; 43-44. For example, Wells Fargo combined the buydown funds it applied towards the loan with other unrelated funds it called "lender credits" in the closing disclosure without explaining it was doing so. *Id.* at Ex. A at 2-J & ¶12. Wells Fargo further disclosed an APR, finance charge, and total payment amount in the closing disclosure that were significantly higher than Mr. Carrillo's actual figures. *Id.* at Ex. A at 5 & ¶43. Wells Fargo's practice of amortizing the loan at the higher interest rate in the first year is difficult, if not impossible, for a non-accountant to detect, and these inaccuracies make its conduct even more inscrutable. FAC¶¶13-14.

Based on these facts, Mr. Carrillo has brought claims on behalf of himself and all other similarly situated borrowers alleging (i) breach of contract, including the covenant of good faith and fair dealing; (ii) violations of GBL § 349; and (iii) violations of TILA. *See* FAC at

---

[2] Calculated using Wells Fargo's amortization calculator: https://mortgagecalculators.wf.com/response/content/clients/lf-wellsfargo/ home.html?toolid=home16&src=lfp_amort. (These numbers are rounded to the nearest dollar. The actual monthly payments are $597.45 and 677.15).

12-14. Wells Fargo moved to dismiss all claims. Magistrate Judge Locke issued a Report and Recommendation in which he recommended denying Wells Fargo's Motion in its entirety. ECF 46. Wells Fargo filed an objection in which it challenged Magistrate Locke's findings that Plaintiff had properly alleged a claim for breach of contract, that Plaintiff had properly alleged that Wells Fargo's conduct was consumer-oriented and materially misleading for purposes of the GBL, and that Plaintiff properly alleged a claim under TILA. Wells Fargo did not object to the conclusion that Plaintiff had properly pled injury for purposes of the GBL, or to Magistrate Locke's recommendation that the motion to strike class allegations be denied.

## III. ARGUMENT

### A. Standard of Review.

Whereas a district court must make a *de novo* determination to specific objections to a magistrate's findings under Fed. R. Civ. P. 72, this does not require that the Court repeat work a magistrate already performed. *See Harris v. TD Ameritrade*, 338 F. Supp. 3d 170, 173-74 (S.D.N.Y. 2018). "To the extent, however, that the party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the Report strictly for clear error." *Id.* at 174; *see also Alvarez Sosa v. Barr*, 369 F. Supp. 3d 492, 497 (E.D.N.Y. 2019). The purpose of objections is not to allow a party "a second bite at the apple by simply relitigating a prior argument." *Chiari v. New York Racing Ass'n Inc.*, 972 F. Supp. 2d 346 (E.DN.Y. 2013). This is because "[t]he goal of the federal statute providing for the assignment of cases to magistrates is to increase the overall efficiency of the federal judiciary[] . . . [and] [t]here is no increase in efficiency, and much extra work, when a party attempts to relitigate every argument which it presented to the Magistrate Judge." *Alvarez Sosa*, 369 F. Supp. 3d at 497 (citations omitted) (alterations in original).

Wells Fargo's objections do exactly what courts have warned against. Unhappy with Magistrate Judge Locke's rejection of the arguments made in its motion to dismiss, Wells Fargo attempts to re-litigate before the Court the same arguments presented in its motion to dismiss. Consequently, the Court should only reverse Magistrate Judge Locke's findings and conclusions upon a finding of clear error. Wells Fargo fails to provide a persuasive argument as to why this Court should reject Magistrate Judge Locke's reasoning or conclusions.[3]

**B.    Magistrate Judge Locke Correctly Upheld the Contract Claims Because the Buydown Agreement is Ambiguous.**

Wells Fargo does not contest that it failed to apply a lower interest rate in the first year of Mr. Carrillo's loan. Rather, it attacks Mr. Carrillo's contract allegations by arguing that no reasonable person could interpret the 2.875 percent initial buydown rate as a promise to charge an interest rate of 2.875 percent in year 1 of the loan.

A court may only dismiss a claim for breach of contract if the contract's terms are unambiguous. *Orlander v. Staples*, 802 F.3d 289, 295 (2d Cir. 2015) ("[I]f a contract is ambiguous as applied to [the facts that furnish the basis of the suit], a court has insufficient data to dismiss a complaint for failure to state a claim." (citation omitted) (alterations in original)). "A contract term is unambiguous if it has 'a definite and precise meaning unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Id.* (citation omitted). Where, as here, an agreement's terms

---

[3] Wells Fargo did not object to Magistrate Judge Locke's conclusions in Part II.A.ii.b(3) (GBL injury) and Part II.B (Motion to Strike the Class Allegations. ECF 48 at 2, n.1. Accordingly, these sections are indisputably subject to clear error review and "the [C]ourt need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Alvarez Sosa v. Barr*, 369 F. Supp. 3d 492, 497 (E.D.N.Y. 2019).

are ambiguous, courts "may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Bank of New York Tr. Co. v. Franklin Advisers, Inc.*, 726 F.3d 269, 276 (2d Cir. 2013) (internal citation omitted). Ambiguities in a contract are construed against the drafter. *McCarthy v. Am. Intern. Grp., Inc.*, 283 F.3d 121, 124 (2d Cir. 2002); *Village of Ilion v. County of Herkimer*, 18 N.E.3d 359, 363 (N.Y. 2014).

Applying this standard to Wells Fargo's motion to dismiss, Magistrate Judge Locke concluded that the "Buydown Agreement is ambiguous on its face," and that "the FAC's allegations, coupled with the Loan Documents, present ambiguities such that the Court is unable to interpret the agreements on a motion to dismiss." Report at 10-11. Magistrate Judge Locke's reading of the contract can hardly be deemed unreasonable.

Wells Fargo contends that its agreements with Mr. Carrillo are unambiguous despite stating in its Buydown Payment Schedule that the "Buydown Rate" applies to the "1st Period" and that the monthly amount of "587.45" due during this period corresponds to "P&I", *i.e.* "principle and interest."[4] And Wells Fargo further acknowledges that it represented the buydown rate as a percentage rate to "reflect[] that under the Buydown Deposit Agreement, Plaintiff's 'initial reduced monthly payment of $597.45' is what a fixed, monthly payment would be 'for a loan at 2.875% annual interest.'" ECF 48 at 7 (quoting ECF 34 at 3).

Moreover, Wells Fargo provided Mr. Carrillo with a Closing Disclosure that is "a statement of final loan terms" and that forthrightly and prominently describes the loan in precisely the manner that Wells now claims no reasonable person could adopt, *i.e.* as having a

---

[4] Confusingly, Wells Fargo's Buydown Payment Schedule subsequently states that the "note will bear an interest rate of 3.875% and that the "1st Period P&I" is "$677.15." *Id*.

"Interest Rate" of "2.875%" in year one but adjusting upward to 3.875 in year 2. Ex. A, p. 1. *See also*, *id*. at p. 4 ("Initial Interest Rate 2.875%"; Minimum/Maximum Interest Rate 2.875%/3.875; First Change Beginning of 13th month).

In its objections, Wells Fargo spends six pages reiterating the same arguments it made in its motion to dismiss, citing the same provisions that are ambiguous on their face and in the context of the loan documents as a whole. Magistrate Judge Locke carefully reviewed these arguments and concluded that the "Buydown Agreement is ambiguous on its face, and it does not provide clear support for Wells Fargo's interpretation of the Buydown Rate." Report at 11.

Wells Fargo first argues that Mr. Carrillo's interpretation of the buydown agreement would create an impermissible double benefit. Magistrate Judge Locke examined and disposed of this argument. *Id.* at 12 ("The Court further rejects Defendant's argument that the Loan Documents' lack of language discussing amortization renders Plaintiff's interpretation of the agreements one that would result in a 'double benefit' of both an interest reduction and a re-amortization of the Loan.").

Wells Fargo's argument misconstrues Mr. Carrillo's position and the language in the buydown agreement. As Magistrate Judge Lock recognized, Mr. Carrillo does not contend that he should have received a discounted monthly payment *in addition to* a lower interest rate. Mr. Carrillo claims that his monthly payment in the first year should have been lower *because* of the reduced interest rate promised in the first year. This is because "[t]he amortization of any loan is axiomatic to the interest being charged, in that the repayment calculation is necessarily derived from the interest accruing on the principal." *Id.* "In other words, the monthly payments on the

Loan are inextricably linked to the interest rate." *Id*.[5]

Wells Fargo argues that Mr. Carrillo's interpretation of the buydown agreement reads language out of the contract. Specifically, it asserts that the provision "[e]ach monthly payment from the buydown deposit will pay only a part of the interest portion," is rendered meaningless if the buydown agreement was meant to lower the interest rate (thereby reducing both the interest and principal owed each month). Magistrate Judge Locke found this argument "irrelevant." Report at 12. He correctly reasoned that "Plaintiff is not complaining about how the deposit was *apportioned*," he is "merely alleging that Wells Fargo applied a higher interest rate on his Loan than the parties agreed to." *Id*. The language is also ambiguous in the context of the entire buydown agreement, which refers to a 2.875 percent buydown rate and lists two "1st Period" rates. *See Holland Loader Co., LLC v. FLSMIDTH A/S*, 313 F. Supp. 3d 447, 467 (S.D.N.Y. 2018) ("In resolving whether an ambiguity exists, the Court must determine whether a clause is ambiguous when read in the context of the entire agreement.") (internal quotation marks and citations omitted).

Second, Wells Fargo faults Magistrate Judge Locke for failing to give meaning to the Buydown Payment Schedule's statement that the note "will bear an interest rate of 3.875%." Wells Fargo's criticism is unfounded. It is logical that reference to the 3.875 percent interest rate would be included to show Mr. Carrillo the applicable rate after the initial period subject to the buydown rate ended. Indeed, the statements that Mr. Carrillo's note will "bear an interest rate of

---

[5] Wells Fargo's reliance on *In re Lipper Holdings, LLC*, 1 A.D. 3d 170, 171 (1st Dep't 2003) is misplaced. *In re Lipper* merely restates the axiom that a contract should not be construed in an unreasonable manner. *In re Lipper*, 1 A.D. 3d at 171. Contrary to Wells Fargo's assertion, Mr. Carrillo's interpretation will not create a "double benefit" that will "bestow a windfall" on Mr. Carrillo or the proposed class.

3.875 percent" and a "1st period P&I" of 677.15 follow the directly conflicting statement that that the "1st Period" Buydown Rate is 2.875 percent and that this corresponds to "P&I", i.e. "principal and interest" of $597.45.

A correct assessment is that that the Buydown Payment Schedule -- which contains two different rates, both applicable to the "1st Period"; both expressed as percentages and both described as corresponding to "P&I" – is not only ambiguous, but a confusing mess. Indeed, the only way that Wells Fargo's interpretation makes any sense is if one understands the phrase "Buydown Rate 2.875%" to unambiguously mean "the dollar amount corresponding to an interest rate of 2.875%, but not an interest rate" and the phrase "1st Period . . . . P & I 597.45" to mean "your payment of 597.45 will NOT cover all principle and interest during these months." Not only is this farfetched but it is rendered even less plausible in light of the fact that Wells Fargo provided Mr. Carrillo with a Loan Disclosure statement that was "a statement of final loan terms" and that repeatedly described 2.875 as the "Interest Rate" for year 1 of the loan.[6]

Third, Wells Fargo argues that the provision stating that the buydown agreement should not be "construed to contradict the Note or Mortgage" confirms that the 3.875 percent interest rate stated in the note was the operative rate throughout the entire loan term, including the year that was the subject of the buydown agreement. This argument ignores the fact that the entire purpose of the buydown agreement is to modify the parties' obligations under the note and

---

[6] Wells Fargo suggests that Magistrate Judge Locke ignored the buydown payment schedule in determining that the buydown agreement is ambiguous. *See* ECF 48 at 6. To the contrary, Magistrate Judge Locke explicitly acknowledged the language in the buydown payment schedule and determined that it contributed to the ambiguity of the buydown agreement. *See* ECF 46 at 3, 11-12. Mr. Carrillo does not dispute that the buydown payment schedule is incorporated in the buydown agreement, but, as noted above, the internally contradictory language in the payment schedule makes the buydown agreement even less clear.

mortgage. For example, the note states that "my monthly payment will be in the amount of U.S. $677.15." ECF 48, Ex. A at 1. But Wells Fargo does not dispute that the monthly amount due in the first year was $597.45. Even Wells Fargo must concede that the Buydown Agreement modified at least some terms in the Note. Further, as Magistrate Judge Locke acknowledged, the closing disclosure, which shows a first-year interest rate of 2.875 percent, "purports to summarize the terms of the Loan." Report at 12, n.5. "Thus, even if the buydown agreement were deemed overridden, the Closing Disclosure also lends support to Mr. Carrillo's interpretation." *Id.*

Wells Fargo next faults Magistrate Judge Locke for purportedly failing to acknowledge the difference between what the schedule refers to as the "Buydown Rate" (2.875 percent) and the "interest rate" (3.875 percent). As explained above, a fair reading is that this simply put the customer on notice that the buydown rate was only temporarily reduced. A reasonable borrower would understand that the 2.875 percent buydown rate (which was bolded and in a larger font) was a temporary rate that was the benefit of entering the buydown agreement. This is to be distinguished from the 3.875 percent interest rate applicable for the rest of the life of the loan.

The case Wells Fargo cites is distinguishable. In *Platek v. Town of Hamburg*, the plaintiffs argued that the provisions "caused by" and "resulting from" meant the same thing although one described an exclusion from insurance coverage and the other the exception to that exclusion. 26 N.E.3d 1167, 1169, 1173 (N.Y. 2015). The court found the plaintiffs' interpretation unreasonable because the exception language would contravene the purpose of the exclusion. *Id.* at 1173. There is no similar conflict here. The 2.875 percent buydown rate and 3.875 interest rate simply describe Mr. Carrillo's rates of interest during different time periods of his loan. Indeed, this is precisely how Wells Fargo itself described the two rates in the Closing

Disclosure.

Wells Fargo also complains that Magistrate Judge Locke provided no explanation or authority for his conclusion that "the fact that the Buydown Rate is shown as a percentage implies that a lower interest rate is in effect." Report at 11. Not surprisingly, courts can use common sense in determining whether a contract is unambiguous. *RCJV Holdings, Inc. v. Collado Ryerson, S.A. de C.V.*, 18 F. Supp. 3d 534, 545 (S.D.N.Y. 2014) ("Because contract interpretation is an exercise in 'common sense' rather than 'formalistic literalism,' 'words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.'") (quoting *Duane Reade, Inc. v. Cardtronics, LP*, 54 A.D.3d 137, 863 N.Y.S.2d 14, 19 (1st Dep't 2008)). Applying common sense, Magistrate Judge Locke correctly concluded that Wells Fargo's use of a percentage rate in the buydown agreement could mean just that – an actual percentage rate and not simply a reduced monthly payment.

Magistrate Judge Locke's reading is consistent with common usage and understanding. *See* Black's Dictionary (11th ed. 2019) (defining interest rate as "[t]he percentage that a borrower of money must pay to the lender in return for the use of the money, usu. expressed as a percentage of the principal payable for a one-year period").[7] And again, Wells Fargo itself adopted Magistrate Judge Locke's understanding in describing the year 1 rate as an "Interest Rate"/the "Initial Interest Rate" in its own Closing Disclosure. Wells Fargo cannot escape its

_____

[7] Wells Fargo's reliance on *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 745-46 (1996), a case involving a determination of whether the term interest included late-payment fees, is misplaced. Magistrate Judge Locke concluded that the use of a percentage rate suggests an interest rate, not that a percentage rate is required to describe an interest rate.

own ambiguous drafting. *See Orlander*, 802 F.3d at 296-97 (finding that a contract was ambiguous "in several respects relevant to Plaintiff's claim" because some of the terms "could certainly be clearer" and were subject to multiple reasonable interpretations).

Finally, Wells Fargo claims that Magistrate Judge Locke creates ambiguity by looking to the closing disclosures. But Magistrate Judge Locke explicitly found that the "Buydown Agreement is ambiguous on its face." Report at 11; *see also id.* at 10 ("it is unclear from the language in the Buydown Agreement whether the parties agreed that interest would accrue at a flat rate of 3.875% throughout the Loan's terms, or if a variable rate was applicable whereby the interest rate was initially 2.875%, increasing to 3.875% in the second year of repayment."). In light of this facial ambiguity, Magistrate Judge Locke examined the closing disclosures and found "uncertainty that cannot be ignored." *Id*. at 10.

## C.   Magistrate Judge Locke Correctly Upheld Mr. Carrillo's GBL § 349 Claim.

"To state a claim for a § 349 violation, 'a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'" Report at 13.[8] Magistrate Judge Locke found that Mr. Carrillo adequately plead all three elements.

### 1.    Wells Fargo's conduct is consumer oriented.

In its motion to dismiss, Wells Fargo argued that Mr. Carrillo did not adequately plead that the challenged conduct is consumer oriented because (1) Mr. Carrillo plead nothing more than an individualized contract dispute and (2) Mr. Carrillo asserted only conclusory allegations

_____

[8] Wells Fargo did not object to Magistrate Judge Locke's conclusion that Mr. Carrillo sufficiently plead a Section 349 injury. ECF 48 at 2, n.1.

regarding boilerplate mortgage documents. Magistrate Judge Locke rejected these arguments stating,

> The FAC, however, alleges more than just a personal grievance, and instead asserts that Wells Fargo regularly markets and offers boilerplate buydown agreements (that purportedly promise a lower initial interest rate than is charged) similar to Carrillo's, in connection with issuing hundreds of thousands of residential loans annually. *See* FAC ¶¶ 15, 17, 52, 55, 73. These contentions are not merely threadbare recitals of Section 349, but instead reflect specific factual allegations directed at wide-ranging deceptive conduct."

Report at 14.

Wells Fargo faults Magistrate Judge Locke for relying on *M & T Mortg. Corp. v. White*, 736 F. Supp. 2d 538 (E.D.N.Y. 2010) and *Kapsis v. Am. Home Mortg. Servicing, Inc.*, 923 F. Supp. 2d 430 (E.D.N.Y 2013). But in support, Wells Fargo merely cites its own reply brief arguing that *White* and *Kapsis* "involved far more than bare allegations of 'boilerplate' contracts and have little in common with this case. The R&R did not consider these clear distinctions." ECF 48 at 9. The fact that Magistrate Judge Locke did not mention Wells Fargo's (incorrect) interpretations of *White* and *Kapsis* does not mean he failed to consider them. *See Farmer v. Camden City Bd. of Educ.*, No. CIV. 03-685JBS, 2005 WL 1683745, at *3 (D.N.J. July 19, 2005) ("That the Court did not explicitly address [a specific] argument in its Opinion, though, does not mean that the Court failed to consider that argument."); *Hinds v. Dallas Indep. Sch. Dist.*, 188 F. Supp. 2d 664, 679 (N.D. Tex. 2002) (same).

Further, *White* and *Kapsis* actually support Mr. Carrillo's claims. Magistrate Judge Locke noted that the following from *White* is instructive:

> The court is not willing to find as a matter of law that a purchase of a home and accompanying mortgage cannot be harmful to the public interest generally and therefore cannot be sufficiently consumer-oriented to comply with the statute…. On the contrary, such practice could easily recur and could potentially impact similarly situated

> consumers and therefore be considered consumer-oriented and
> harmful to the public at large…. While the deceptive practices were
> aimed at particular individuals in these instances, nothing suggests
> that similarly vulnerable consumers could not — and did not — fall
> victim to similar practices, and there is nothing especially unique or
> unusual about these particular transactions.

Report at 14-15 (quoting *White*, 736 F. Supp. 2d at 571). While *White* was decided on a motion

for summary judgment, the quoted language appears in the court's discussion of black-letter law

regarding consumer-oriented conduct. The court's statements in *White* are not fact-dependent

proclamations as Wells Fargo claims, but are affirmations of existing case law. Indeed, the court

in *White* cited a litany of cases discussing consumer-oriented conduct in the context of mortgages

and/or the use of boilerplate documents. *White*, 736 F. Supp. 2d at 571-72 (citing *Oswego

Laborers' Local 214 Pension Fund v. Marina Midland Bank*, 647 N.E.2d 741, 745 (N.Y. 1995)

(denying summary judgment on Section 349 claim wherein "defendant bank dealt with plaintiffs'

representative as any customer entering the bank" and furnished standard forms and advice as it

would with any member of consuming public); *Exxonmobil Inter-Am., Inc. v. Advanced Info.

Eng'g Servs., Inc.*, 328 F. Supp. 2d 443, 449 (S.D.N.Y. 2004) (Section 349 liability "attaches

primarily where a party's misrepresentations are boilerplate and have the potential to be repeated

in order to deceive numerous similarly situated buyers."); *Gaidon v. Guardian Life Ins. Co. of

America,* 725 N.E.2d 598, 603 (N.Y. 1999); *but cf. Canario v. Gunn,* 300 A.D.2d 332, 333, 751

N.Y.S.2d 310 (2d Dep't 2002) (affirming dismissal of Section 349 claim wherein the

"misrepresentation had the potential to affect only a single real estate transaction involving a

single unique piece of property."); *Banc of Am. Commercial Fin. Corp. v. Issacharoff,* 188

Misc.2d 790, 728 N.Y.S.2d 861, 867–68 (N.Y.Sup.Ct.2000) (dismissing borrower's Section 349

affirmative defense and counterclaim in foreclosure action because bank's conduct was

"particular to [borrower] and not a type of standard practice" and was a "private contract unique to the[ ] parties")).

In *Kapsis*, the plaintiff filed a class action complaint against his loan provider and the loan servicer ("AHMSI") claiming, *inter alia*, that AHMSI failed to properly credit borrowers' accounts and issued misleading monthly statements. *Kapsis,* 923 F. Supp. 2d at 449–50. Like Mr. Carrillo, the plaintiff in *Kapsis* alleged that the defendant's conduct was consumer oriented and that the class consisted of "tens-of-thousands of individuals whose residential mortgage loans are serviced" by AHMSI and that "AHMSI's alleged deceptive acts and practices 'affect[ ] consumers at large.'" *Id.* at 450. Like Wells Fargo, AHMSI moved to dismiss claiming that the plaintiff had not properly plead consumer-oriented conduct. The court rejected AHMSI's arguments and found that the plaintiff's allegation that AHMSI "engaged in deceptive practices directed not just at him, but also at a large class of similarly situated debtors" was sufficient to establish consumer-oriented conduct. *Id.*

Magistrate Judge Locke's conclusion is legally sound based on *White* and *Kapsis* alone, but he cited additional supportive authority, including *Interested Underwriters at Lloyd's of London Subscribing to Policy No. 991361018 v. Church Loans & Investments Tr.*, 432 F. Supp. 2d 330 (S.D.N.Y. 2006). The court in *Interested Underwriters* "den[ied] [a] motion to dismiss a Section 349 complaint alleging that the defendant issued boilerplate contracts, noting that '[d]ecisions from New York Appellate Division courts have emphasized that standard agreements and policies are significant in showing that challenged actions are consumer-oriented.'" Report at 15 (quoting *Interested Underwriters*, 432 F. Supp. 2d. at 334). In short, Magistrate Judge Locke's conclusion rests on solid legal precedent and Wells Fargo has not met its burden of showing otherwise.

Wells Fargo asserts that "[r]ecent cases agree that conclusory allegations of form policies are not enough to allege a GBL § 349 claim." ECF 48 at 10. Wells Fargo implies that these "recent cases" somehow repudiate Magistrate Judge Locke's Report. To the contrary, the "recent cases" affirm established principles related to Section 349. In fact, the "recent cases" were decided *before* Magistrate Judge Locke issued his Report and Recommendation. The only three cases not already briefed in the underlying motion – *H&H*, *Disa Realty*, and *Sellers* – are factually distinguishable and provide no support for rejecting Magistrate Judge Locke's opinion.

*H&H Envtl. Sys., Inc.* involved a dispute between a corporate plaintiff that provided "precision repair, maintenance, and calibration of environmental chambers, as well as rental sales and services" and two insurance company defendants that wrote policies covering the equipment. *H&H Envtl. Sys., Inc. v. Evanston Ins. Co.*, No. 6:18-CV-06315 EAW, 2019 WL 1129434, at *1 (W.D.N.Y. Mar. 12, 2019).[9] After suffering damage to "precision equipment items," the plaintiff filed claims with the insurance companies. The plaintiff then sued when it became dissatisfied with the companies' handling of the claims, and alleged, *inter alia,* that the insurance companies' conduct violated Section 349. *Id.*, at *1-2. The court granted the defendants' motions to dismiss, finding that the plaintiff's lack of factual allegations concerning consumer-oriented conduct was fatal to the GBL claim. Specifically, the court stated, "Plaintiff makes the following conclusory allegation: 'Upon information and belief, when confronted with a policyholder's significant loss claim, Defendants regularly and routinely engage in the practice of avoiding or inordinately delaying the settlement of the claim[.]'" *Id.* at *9.

---

[9] Of note, the court observed, "The statute's consumer orientation does not preclude its application to disputes between businesses per se, but it does severely limit it." *Id.* at *9 (quoting *Cruz v. NYNEX Info. Res.*, 263 A.D.2d 285, 290 (1st Dep't 2000)).

Mr. Carrillo's First Amended Complaint contains more than a single, "upon information and belief" allegation of consumer-oriented conduct and involves a common-place consumer transaction involving standardized documents and loan balance calculations, not a commercial insurance dispute. In finding that Mr. Carrillo properly alleged consumer-oriented conduct, Magistrate Judge Locke cited but a few specific factual allegations in the FAC "directed at wide-ranging deceptive conduct." Report at 14 (citing FAC ¶¶15, 17, 52, 55, 73). These allegations include:

- Wells Fargo is one of the largest originators and servicers of residential mortgages, nationwide, making hundreds of thousands of residential loans every year. FAC ¶¶15, 52;

- Wells Fargo regularly markets and offers temporary payment reduction options, including its rate buydown programs, to consumers nationwide. FAC ¶17, 52, 73; and

- The rate buydown program at issue in this case has been offered to the general public and each class set forth herein includes hundreds, if not thousands of consumers. FAC ¶55, 73.[10]

These allegations sufficiently establish consumer-oriented conduct. But Mr. Carrillo also alleges that Wells Fargo uses boilerplate documents and disclosures generated through highly automated procedures to memorialize the agreements, (FAC ¶¶17, 52-55, 7), and that Wells Fargo's uses standard practices, and methods for calculating interest rates. FAC ¶¶1-2, 7-9, 54. The numerous allegations in this case stand in stark contrast to the lone allegation in *H&H*.

In *Disa Realty, Inc.*, the plaintiff sought to foreclose on a mortgage and the defendant included a Section 349 counterclaim in his answer. *Disa Realty, Inc. v. Rao*, 168 A.D.3d 1037,

---

[10] See also, FAQ at ¶16 (stating that "Adjustable-rate mortgages are one of Wells Fargo's most popular residential loan types").

1038 (N.Y. App. Div. 2019). The defendant claimed the plaintiff made false representations about the subject property's income and expenses. The court found the allegations "self-serving" and inconsistent with the terms of the written contract. The court concluded, "In any event, the alleged misrepresentations complained of were specific to the subject property and, thus, do not constitute consumer-oriented conduct falling within the ambit of [§ 349]." *Disa Realty*, 168 A.D.3d at 1040. Wells Fargo's use of form documents for its nationwide residential mortgage business is a world apart from the representations about a single property in *Disa Realty*.

In *Seller v. Citimortgage, Inc.*, the plaintiffs brought a Section 349 claim based on allegations that Citimortgage instructed plaintiffs "to make four mortgage payments at a reduced rate" so that they could become delinquent in order to qualify for a loan modification. *Seller v. Citimortgage, Inc.*, 118 A.D.3d 511 (N.Y. App. Div. 2014). The court dismissed, concluding that Citimortgage's instruction was specific to the plaintiffs and not consumer oriented. *Seller*, 118 A.D.3d at 511. Mr. Carrillo does not allege that the conduct at issue is the work of a rogue customer service representative as in *Seller*. Rather, Mr. Carrillo's buydown agreement was consistent with Wells Fargo's standard practice and procedure of representing to consumers that they can buy down the interest rate for the first year of the loan when, in fact, Wells Fargo merely reduces the first years' monthly payments but not the interest rate.

Finally, it is worth noting the Wells Fargo is careful not to deny that it offers thousands of loans of the type at issue in this case, nor that it calculates all of these borrowers' balances in the manner alleged. Rather, "[a]n initial assessment . . . indicates that Defendant readily admits applying interest rates higher then the buydown rates, and instead takes the position that the contracts at issue call for such an interpretation." Report at 30.

2.     Wells Fargo's conduct is materially misleading.

Wells Fargo's objection to Magistrate Judge Locke's finding that Mr. Carrillo adequately

- 19 -

plead Section 349's materially misleading element merely references its breach of contract argument. ECF 48 at 9. Wells Fargo provides no additional basis to reject Magistrate Judge Locke's conclusion.

Magistrate Judge Locke noted that the materially misleading element is an objective standard "under which the alleged act must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" Report at 15-16 (quoting *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007) (further citations omitted)). After noting that because the materially misleading element "requires a reasonableness analysis [best suited for a jury], it cannot be resolved on a motion for dismiss," (Report at 16 (quoting *Buonasera v. Honest Co., Inc.*, 208 F. Supp. 3d 555, 566 (S.D.N.Y. 2016)), Magistrate Judge Locke stated:

> Here, the Amended Complaint sufficiently alleges that Wells Fargo's lending practices are likely to mislead reasonable consumers. Specifically, Carrillo claims that Wells Fargo offers its customers buydown agreements that promise a reduced interest rate on their mortgage loans in the first year of repayment, but then amortizes the payments by applying a higher rate from the onset.

*Id.* (citing FAC ¶¶38, 40, 71). After making this determination, Magistrate Judge Locke further found that the Loan Documents are ambiguous. Specifically, Magistrate Judge Locke found that "the Loan Documents are ambiguous in that the contracts indicate that a reduced interest rate will indeed be applied to the principal during the initial period such that a reasonable consumer could be misled as to the Loan Documents' intention." *Id.*

### D. Magistrate Judge Locke Correctly Upheld Mr. Carrillo's TILA Claim.

The purpose of TILA is to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601. "As a result, 'creditors [are required] to provide borrowers with clear and accurate disclosures of terms dealing with things like … annual

percentage rates of interest…." Report at 18 (quoting *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412, 118 S. Ct. 1408, 1410 (1998) (citations omitted)).

Section 1638(b)(2(C)(ii) requires lenders to disclose "an example that reflects the maximum payment amount of the regular required payments on the extension of credit, *based on the maximum interest rate allowed under the contract*." (emphasis added). Magistrate Judge Locke correctly found that Mr. Carrillo's TILA claim is plausible stating:

> [T]he same misleading ambiguities relevant to the contractual and GBL causes of action may render the Loan Documents an inaccurate reflection of the credit being extended. The Loan Documents' apparent representation that Carrillo would be charged a 2.875% interest rate in his first year of repayment, when the rate being applied was 3.875%, potentially renders the Closing Disclosure an erroneous representation of the Loan's terms.

Report at 19.

In its objections, Wells Fargo makes the same argument it made in its motion to dismiss: that its closing disclosure "accurately reflected the regular required payments based on the 3.875% interest rate allowable under the Note." ECF 48 at 11. But this argument fails to address Mr. Carrillo's claim that Wells Fargo violated TILA because the disclosures set forth one interest rate for the initial period (2.875 percent) without disclosing that it was not the applicable interest rate, and that Mr. Carrillo would actually be charged a higher interest rate due to Wells Fargo's method of amortization. FAC ¶¶83-86. Wells Fargo did not disclose that the first-year payments only "correspond" to the promised lower interest rate, and that Wells Fargo would amortize the first year at the higher interest rate. Instead, its own Closing Disclosure summarizing the transaction prominently and repeatedly states that the Carrillo will receive an "interest rate" of "2.875%". Magistrate Judge Locke agreed with Mr. Carrillo, stating:

> Thus, although the Loan Documents appear to state the "examples of adjustments to the regular required payment," these alterations are not in fact "based on the change in the interest rates specified by

> the contract," as required by the statute. 15 U.S.C. §
> 1638(b)(2)(C)(ii). Instead, the reduced monthly payments in the first
> year merely account for the prorated deposit being applied.

Report at 19-20. Wells Fargo's misdirection unlawfully increased Mr. Carrillo's principal loan balance at the end of the first year by $478.13. Over the life of the loan, Wells Fargo's unlawful practice will cost Mr. Carrillo an extra $1,471.00. And Wells Fargo engages in this conduct nationwide with thousands of consumers.

## IV.  CONCLUSION

Based on the foregoing, the Court should adopt the Report and Recommendation in its entirety.

RESPECTFULLY SUBMITTED AND DATED this 5th day of July, 2019.

TERRELL MARSHALL LAW GROUP PLLC

By:  */s/ Beth E. Terrell*
Beth E. Terrell, *Admitted Pro Hac Vice*
Email:  bterrell@terrellmarshall.com
Adrienne D. McEntee, *Admitted Pro Hac Vice*
Email:  amcentee@terrellmarshall.com
Brittany J. Glass, *Admitted Pro Hac Vice*
Email: bglass@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

*/s/ Brian K. Herrington*
Brian K. Herrington, *Admitted Pro Hac Vice*
Email: bherrington@consumerprotection.net
SCHLANGER LAW GROUP LLP
602 Steed Road, Suite 100
Ridgeland, Mississippi 39157
Telephone: (601) 566-1538
Facsimile: (646) 612-7996

*/s/ Daniel A. Schlanger*
Daniel A. Schlanger
Email: dschlanger@consumerprotection.net

SCHLANGER LAW GROUP LLP
9 East 40th Street, Suite 1300
New York, New York 10016
Telephone: (212) 500-6114
Facsimile: (646) 612-7996

*Counsel for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I, Beth E. Terrell, hereby certify that on July 5, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jennifer M. Rosa
Email: jrosa@mayerbrown.com
Robert W. Hamburg
Email: rhamburg@mayerbrown.com
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 506-2500
Facsimile: (212) 262-1910

Debra Lee Bogo-Ernst, *Admitted Pro Hac Vice*
Email: dernst@mayerbrown.com
Lucia Nale, *Admitted Pro Hac Vice*
Email: lnale@mayerbrown.com
Jed W. Glickstein, *Admitted Pro Hac Vice*
Email: jglickstein@mayerbrown.com
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

*Attorneys for Defendant*

DATED this 5th day of July, 2019.

TERRELL MARSHALL LAW GROUP PLLC

By:  /s/ Beth E. Terrell
Beth E. Terrell, *Admitted Pro Hac Vice*
Email: bterrell@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

*Attorneys for Mr. Carrillo*